RECEIVED

NOV 13 2023

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

**Attachment 1 - Civil Complaint**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
<u>SAN ANTONIO</u>    DIVISION

RUBEN GABRIEL BETANCOURT
Plaintiff,

# SA23CA1435 FB

CASE NUMBER: _____
(Supplied by Clerk's Office)

vs.

CPS ENERGY,
Defendant

**JURY DEMANDED**

## COMPLAINT

**TO THE HONORABLE U.S. DISTRICT COURT JUDGE OF SAID COURT:**

**NOW COMES,** Ruben Gabriel Betancourt, hereinafter referred to as Plaintiff, complaining of and about CPS Energy, hereinafter referred to as Defendant, and files this his Complaint and for cause of action will show unto the Court as follows:

### I.
### PARTIES

1.  Plaintiff, Ruben Gabriel Betancourt, a former employee of Defendant, is a citizen of the United States and the State of Texas and resides in Bexar County.

2.  Defendant, CPS Energy, Plaintiff's former employer, is a domestic corporation doing business in San Antonio, Bexar County, Texas, and may be served with process by serving its **CEO, Rudy Garza, at 500 McCullough Ave., San Antonio, TX 78215.**

1

## II.
## JURISDICTION AND VENUE

3.  The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331-Federal question as this case presents a federal question.

4.  Moreover, venue is proper in this district pursuant to 28 U.S.C. § 1391 (b) (1)-(2)-Venue generally, as this is the district in which Defendant resides and it is the district in which a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.

## III.
## NATURE OF ACTION

5.  This is an action pursuant to 42 U.S.C. §§ 12112-Discrimination and 12203-Prohibition against retaliation and coercion for the correction and recovery on behalf of the Defendant's unlawful employment practices on the basis of Plaintiff's disability and/or perception of disability (Anxiety, Depression, PTSD) and retaliation as a result of Plaintiff's protected complaint.

## IV.
## CONDITIONS PRECEDENT

6.  All conditions precedent to jurisdiction have occurred or been complied with: a charge of discrimination was filed with the Equal Employment Opportunity Commission and the Texas Workforce Commission – Civil Rights Division within three hundred days of the acts complained of herein and Plaintiff's Original Complaint is filed within ninety days of receipt of the Equal Employment Opportunity Commission's issuance of Notice of Right to Sue (see Ex. 1).

## V.
## FACTS

7.  The Plaintiff began employment with CPS Energy on January 10, 2022, as stated in the Plaintiff's offer letter **(see Ex. 2)**.

8.  On the night of April 12, 2022, the Plaintiff received a call from an external radiology department stating that the Plaintiff needed to immediately be admitted to the emergency room contrary to the Defendant's EEOC position statement referring to the Plaintiff's emergency appendectomy as a "planned procedure" for which the Defendant had the Plaintiff's emergency appendectomy surgery discharge paperwork. This was long after the Defendant exploited the Plaintiff's private health information, including said discharge paperwork, furthermore, proving the Defendant's negligence in an attempt to unconsciously claim pretextual matters pertaining to the Security Department's investigation of the Plaintiff's medical information.

9.  The Plaintiff was admitted into the Baptist Medical Surgery Unit on the early morning of April 13, 2022, where performing surgeon Andrea Garcia, M.D. performed an emergency appendectomy with discharge orders specifically pertaining to "home," a work from home environment, which was the primary nature of the Plaintiff's employment beginning January 10, 2022. The discharge paperwork states, "progressive ambulation" under "Discharge Activity," defined as the ability to walk from place to place with or without assisted devices **(see Ex.3)**.

10. The Plaintiff made immediate supervisor, former Director of Communications Christine Patmon, aware that the Plaintiff received work from home instructions and was instructed to provide a Return-to-Work date of April 18, 2022, as seen in the discharge paperwork, which states "no lifting over 20 lbs. for 6 weeks," **(see Ex. 4)**.

3

11. On April 25, 2022, the Plaintiff returned to CPS Energy headquarters even though former Director of Communications Christine Patmon was aware of the Plaintiff's high acidity levels due to the performed appendectomy. Christine Patmon demanded that all public relations professionals attend the CPS Energy monthly board meetings.

12. The Plaintiff misplaced an ID badge and immediately followed CPS Energy's Lost/Stolen Access Identification Badges Policy found on pg. 28a of CPS Energy's General Workplace Security policy (see Ex. 5).

13. The Defendant's termination letter holds no merit, being that the accusations against the Plaintiff are generalized without specific occurrences in an effort to defame and retaliate against the Plaintiff. The termination letter was written long before the Defendant chose to acknowledge the Plaintiff's one-party consent audio recordings. Again, this was not brought to the Plaintiff's attention until after termination. Furthermore, the Defendant cannot prove that the Plaintiff was presented with the specific actions of violation within these generalized policies prior to the termination (see Ex. 20).

14. The Plaintiff immediately reported the ID badge missing. The Plaintiff assumed that one of the many security officials walking the floor would help retrieve it, but instead, the Plaintiff was prompted to pay for a new reissue by Security Clerk Ariana Preciado.

15. Security Clerk Ariana Preciado had the Plaintiff file a reissue form and even reprinted the ID badge, but while handing it over, she pulled it away from the plaintiff's hand and questioned when the last entry into headquarters took place. The plaintiff responded with an assumption and made the best-educated guess. The plaintiff stated, "I think Thursday," which Security Clerk Ariana Preciado rebutted with, "That's funny because your badge was used this morning," which made no sense to the plaintiff considering that entering

headquarters and scanning the ID badge would be necessary in order to misplace it within the premises, this being the only reason the Plaintiff had the pleasure of speaking to Security Clerk Ariana Preciado.

16. The security department did not assist the Plaintiff with the relocation of the ID badge. The Plaintiff only immediately reported it lost in an attempt to follow policy. The Plaintiff now understands that there was no need for a sense of urgency, contrary to what their policy states. The Plaintiff was left to search for the said "Critical Security device" alone. This now seeming to be far less than a critical issue. The Plaintiff discovered that the ID badge was tucked into a laptop bag with numerous pockets. The Plaintiff then returned the misplaced ID badged, which Security Clerk Ariana Preciado exchanged for the reissue that the Plaintiff had previously paid for when filling out the prompted paperwork. The Defendant claims that the Plaintiff failed to safeguard a security badge; this claim is false, considering that it was factually discovered in the Plaintiff's laptop bag. All of which could have been avoided had their General Workplace Security Policy provided competent instruction according to the nature in which the Defendant would evidently prefer to handle the situation. Please see how retaliation is not described within the formality of these policies (see Ex. 6).

17. On April 26, 2022, the Plaintiff attended a city council meeting. The Plaintiff's work duties were interrupted by a call from Investigator Jonathan Herring stating that he needed the Plaintiff to report to headquarters within 30 minutes. When asked to reschedule, he rebutted and provided no context for his sense of urgency.

18. When the Plaintiff arrived at headquarters, he was met with Investigator Jonathan Herring, who escorted the Plaintiff into a boardroom where the Manager of Security of Operations,

5

Vanessa Hurtado, patiently waited.  Investigator Jonathan Herring immediately closed the

door behind the Plaintiff. Investigator Jonathan Herring acknowledges this interrogation by

stating, "Can you hear me, ok? Hey, I just asked my manager Vanessa Hurtado to step into

the room. She was the one that was in there when we spoke last week **(see Ex.11).**

19. The Plaintiff began to experience PTSD triggers, anxiety, and depression from the obvious

nature of their performed interrogation. The Plaintiff felt alone. The Plaintiff sat patiently

and attempted to answer any questions that the security department asked. All of which

were open-ended questions that seemed to fit an ulterior motive.  Questions such as: "What

were you on? What medications are you taking? Do you know of any medication

interactions? What are your diagnoses?"

20. Investigator Jonathan Herring requested a list of the Plaintiff medications, which Manager

of Security Operations, Vanessa Hurtado, objected to, stating that HR would be reaching

out to the Plaintiff to request the medical documentation. A claim she willingly admits to

**(see Ex. 10).**

21. That same day, Investigator Jonathan Herring called the Plaintiff and stated that he should

tell immediate supervisor, former Director of Communications Christine Patmon, about the

details of the medical information in question.

22. On May 3, 2022, Investigator Jonathan Herring called to personally request the Plaintiff's

medical documents, which created confusion because his direct supervisor, Manager of

Security Operations Vanessa Hurtado, had already stated that HR would be reaching out for

this documentation during their interrogation. This was Investigator Jonathan Herring's

second attempt to obtain the Plaintiff's medical documentation contrary to the instruction of

his direct supervisor, Manager of Security Operations, Vanessa Hurtado. The Plaintiff now

6

assumed that something was wrong. Investigator Jonathan Herring provided the Plaintiff

with a deadline of May 4, 2022, by 5 pm for submission of the medical documents.

23. On May 4, 2022, the Plaintiff called Investigator Jonathan Herring for clarification on what

documentation was being requested by his set deadline. When the Plaintiff asked him for a

point of contact, he did not provide one and simply added his direct supervisor, Manager of

Security Operations Vanessa Hurtado, to the call **(see Ex. 7)**.

24. Manager of Security Operations, Vanessa Hurtado, stated, "In order to understand what

you're taking," "what medication you were prescribed is part of the investigation." She did

not provide a response as to why" **(see Ex. 8)**.

25. The Plaintiff reiterated a request for clarification because Manager of Security Operations,

Vanessa Hurtado, had previously stated that HR would be reaching out for this

documentation. The Plaintiff informed Manager of Security Operations, Vanessa Hurtado,

that he had not been contacted by HR and that the only contact the Plaintiff received was

from Investigator Jonathan Herring, again requesting the Plaintiff's medical records. When

the Plaintiff asked her for a point of contact, she directed the Plaintiff to assigned Human

Resources Generalist Jennifer E. Garza Vasquez **(see Ex. 9)**. Also, Manager of Security

Operations Vanessa Hurtado stated that HR asked them to "basically request" the medical

information which was strange considering that she continued to request the documentation

without the supposed request from HR **(see Ex. 10)**. She then went on to mention that the

security department had provided the Plaintiff with a deadline and she "highly suggests

providing that." Investigator Jonathan Herring then returned to the call and reiterated that

he had previously set a 5 pm deadline. Investigator Jonathan Herring stated if something

should come up, the Plaintiff should contact him and make him aware **(see Ex. 11)**.

26. On the same day of May 4, 2022, the Plaintiff contacted assigned HR Generalist Jennifer E. Garza-Vaquez, who Manager of Security Operations, Vanessa Hurtado, stated was her point of contact for the medical documentation request. The Plaintiff asked Sr. HR Generalist Jennifer E. Garza-Vasquez if she knew about an ongoing investigation on the Plaintiff's behalf, and to her surprise, she expressed that she was unaware of "anything like that going on." She additionally stated, "If it's an HR concern, they should loop me in as the generalist for Corp Comm and for you." This comment infers a presence of unfamiliarity with the security department's method of obtaining private health information (see Ex. 12).

27. The Plaintiff additionally asked Sr. HR Generalist Jennifer E. Garza-Vasquez what should be done about the security department's deadline, to which she reassured the Plaintiff, "You're going to work with me, don't provide them any information, especially since they're asking for medical documentation." She also goes on to state that providing them with private health information would not be correct considering HIPPA laws (see Ex. 13).

28. On May 4, 2022, as per Investigator Jonathan Herring's request, the Plaintiff called him back to notify him that HR had specifically asked the plaintiff to deny their requests for medical documentation contrary to what Manger of Security Operations, Vanessa Hurtado had previously stated. It now appeared that contrary to the statement of Manger of Security Operations, Vanessa Hurtado, the Plaintiff's medical documents were not at liberty to be a part of the security department's investigation.

29. Investigator Jonathan Herring disregarded the specific instructions the plaintiff relayed to him on behalf of Sr. HR Generalist Jennifer E. Garza-Vasquez. Investigator Jonathan Herring attempted to tell the Plaintiff that he was, in fact, working with HR even though the

Plaintiff had followed as instructed and reached out to the security department's said point of contact, Sr. HR Generalist Jennifer E. Garza-Vasquez who told the Plaintiff to deny them of the medical documentation request. When the plaintiff specified to Investigator Jonathan Herring that he was instructed not to provide anything by their point of contact, he threatened the Plaintiff with HR and the legal department. The Plaintiff now felt that the security department was conspiring against him **(see Ex. 14).**

30. The Plaintiff then emailed Sr. HR Generalist Jennifer E. Garza-Vasquez the following email. "Jennifer, I spoke to Jonathan after our initial phone call today, and he told me that If I don't submit my medical information by EOD, then I am refusing to cooperate. He insinuated there would be consequences for me refusing to turn in my medical information. He then mentioned that legal was involved. I want to make sure there won't be any actions for not submitting my list of medications to the Security Department and unfortunately, these scare tactics are working, causing anxiety about my career and livelihood. I'm having my fiancé drive me to a clinic because I'm having trouble breathing with my anxiety rising. I apologize for all of this" **(see Ex. 15).**

31. The Plaintiff was seen by Dr. John Lehew, D.O., at the Texas MedClinic, where they performed an EKG, and the Plaintiff was prescribed an additional anxiety medication due to the traumatic distress experienced by CPS Energy's Security department. Please see Dr's diagnosis pertaining to abnormal psych Diagnosis #1 Anxiety and the prescription for the newly prescribed medication **(see Ex. 16).** Please see additional testimony from the Plaintiff's Mental Health Council pertaining to the specific actions regarding the Defendant's retaliation. Said mental health professionals have worked with the plaintiff for years, successfully aiding and improving PTSD, Anxiety, and Depression from prior life

circumstances pertaining to exploitation and interrogation in the same nature of which the security department held their investigation. John Jacobson, LPC, CCTP Clinical Director, reports "depressed mood, lack of sleep, and increased stress response due to the investigation, specifically from the lack of clarity from the investigation and job insecurity. **(see Ex. 25 and Ex. 24)**

32. Sr. HR Generalist Jennifer E. Garza-Vasquez only responded to the Plaintiff's email via voicemail. She stated for the third time that the Plaintiff did not have to provide anything to the security department. Sr. HR Generalist Jennifer E. Garza-Vasquez states that the Plaintiff is doing everything requested of him. **(see Ex. 17)**.

33. On May 5, 2022, the Plaintiff was contacted by Sr. HR Generalist Jennifer E. Garza-Vasquez—who seemed to have a random change of heart and now found an interest in the medical documentation—and Interim Manager for Occupational Health Jorge Vasquez, they asked the Plaintiff to provide them with all of the emergency surgery discharge documentation and a list of medications, including the newly prescribed anxiety medication. This was spontaneous, and the Plaintiff wasn't even sure why all of this was needed. No one ever spoke to the Plaintiff. When the Plaintiff's surgery discharge paperwork was not enough, Interim Manager for Occupational Health Jorge Vasquez additionally requested the Plaintiff's primary care physician's contact information in order to file a Fitness for Duty. Which mostly seemed irrelevant in part considering that the plaintiff's primary care physician was not the performing surgeon or any of the Plaintiff's mental health practitioners, they being the only medical professionals with relevance to the Plaintiff's medications for review. Interim Manager for Occupational Health Jorge Vasquez's Fitness for Duty was requested an entire 22 days after the Plaintiff's emergency

appendectomy. The Plaintiff had already returned to work. As per the instructions of HR, the Plaintiff emailed them all of the requested medical documentation that the security department had previously requested **(see Ex. 18)**.

34. After the Plaintiff submitted all requested medical documentation and information to the Occupational Health department as instructed by HR, the Plaintiff wrote a formal complaint against Investigator Jonathan Herring and Manager of Security Operations Vanessa Hurtado, detailing the security department's harassment and consequential threats, and emailed it to assigned Sr. HR Generalist, Jennifer E. Garza Vasquez **(see Ex. 19)**. Immediately after sending the formal complaint email to assigned Sr. HR Generalist Jennifer E. Garza Vasquez, the plaintiff's laptop was locked, and the Plaintiff was banned from CPS Energy's intranet and placed on involuntary Administrative Leave from May 6th through the 12th. This was done through the guise of a review of the Plaintiff's Fitness for Duty, 22 whole days after the Plaintiff's emergency appendectomy after the Plaintiff had already returned to work.

35. On May 13, 2022, as directed by former Director of Communications Christine Patmon, the Plaintiff was instructed to meet with her at CPS Energy headquarters. Before the meeting began, former Director of Communications Christine Patmon said that she heard rumors that the Plaintiff was inebriated. The Plaintiff assumed that this rumor was generated by the security department, being that this claim held no merit considering that the Plaintiff was not inebriated and had not performed a urine analysis for the Defendant's records in order to factually claim so, nor were there any conflicts within the Plaintiff's Fitness for Duty. Former Director of Communications Christine Patmon said nothing else and was deflective as the Plaintiff chose to professionally disregard rumors, especially considering that this

was not brought to the Plaintiff's attention within any professional capacity until long after the Plaintiff's Texas Workforce Commission wrongful termination hearing on which the Defendant appealed. The Plaintiff's termination letter **(see Ex. 20)** did not describe this occurrence, nor was the Plaintiff spoken to regarding this by HR, Compliance, Communications, or the Security Department. There was no inference of this occurrence by anyone other than former Director of Communications Christine Patmon until Sr. HR Generalist Jennifer E. Garza-Vasquez identified the Plaintiff as inebriated during the Defendant's unemployment benefits appellate hearing. The second time the Plaintiff was made aware of this occurrence was when the Defendant provided two pictures of the Plaintiff correcting himself within the parking garage to the Equal Employment Opportunity Commission along with their position statement. This was long after the denial of CPS Energy's Texas Workforce Commission appeal of the Plaintiff's unemployment benefits. After the Texas Workforce Commission hearing, the Defendant's appeal was denied, and TWC Reason for Decision states, "Our investigation found that your employer fired you for a reason that was not misconduct connected with the work." The Determination of Employers Chargeback states, "We will bill the employer's account" **(see Ex. 21).**

36. On June 1, 2022, a CPS Energy Compliance Officer stated he was providing me with a high-level close-out of how compliance reviewed the Plaintiff's formal complaint against the security department. Compliance was dismissive and passed the issues off as "process improvements and recommendations for the business area." Compliance claimed the lack of communication happened between the two Sr. HR generalists, Sr. HR Generalist Jennifer E. Garza-Vasquez, and another supposed HR Generalist with whom the Plaintiff was never

provided the contact information for. The Defendant's claim is evidently false considering

that Manger of Security Operations Vanessa Hurtado stated that the Plaintiff's HR

representative was the individual who approved their medical document request **(see Ex. 9).**

Compliance stated that when the Plaintiff called assigned Sr. HR Generalist, Jennifer E.

Garza-Vasquez, she was unaware and claimed that this was the reason she told the Plaintiff

not to send anything to the Security Department. The Plaintiff did not understand how Sr.

HR generalist Jennifer E. Garza-Vasquez was unaware, considering that the Plaintiff made

her aware.  Compliance stated that the security department could have provided the Plaintiff

with a name, phone number, and email regarding the Plaintiff's request for a point of

contact. Compliance also stated they met with leadership, HR, and security and were

"taking the review as process improvements moving forward so it wouldn't happen again,"

insinuating that an act that cannot reoccur took place and would be in the best interest of the

Defendant if the action did not reoccur in the future. Upon closing the Plaintiff's formal

complaint to HR, the Compliance Officer stated that the security department's actions

"were not deemed inappropriate." Compliance concluded the conversation, which was the

last time the Plaintiff heard about the security department's ongoing investigation. The

Compliance Officer made the Plaintiff aware that the formal complaint would have no

effect on the ongoing investigation by the security department **(see Ex. 22).** This clearly

inferred retaliation. Compliance states twice that the Plaintiff's complaint was reviewed

with leadership.

37. The Plaintiff was confused by the Compliance Officer's closeout of the formal complaint

    due to the fact that after assigned Sr. HR Generalist Jennifer E. Garza Vasquez was

    involved, she was accompanied by Interim Manager of Occupational Health Jorge Vazquez.

This was the correct practice, and this is something the supposed alternate HR professional assisting the Security Department did not do. The Defendant states that the Security Department followed the supposed HR generalist's instructions as stated by the Compliance Officer and Security; if this is true, then the Security Department was instructed to exploit the Plaintiff's private health information without medical personnel or HR guidance. To the contrary, within the documentation of the Plaintiff's evidence, as stated by Sr. HR Generalist Jennifer E. Garza Vasquez, "If it's an HR concern, they should loop me in as the generalist for Corp Comm and for you" (see Ex. 12). This leads the Plaintiff to conclude that the Defendant is hiding willful negligence through pretext considering that Sr. HR Generalist Jennifer E. Garza Vasquez stated that the security department's practice was a concern involving HIPPA legalities and additionally when the Plaintiff willingly surrendered the requested medical information, Sr. HR Generalist, Jennifer E. Garza-Vasquez, stated that there was not a need for security to have this information (see Ex. 26).

38. On July 1, 2022, former Director of Communications Christine Patmon scheduled a spontaneous check-in with the Plaintiff via Zoom that the Plaintiff was required to attend. This was odd, considering it was the first check-in within 172 days regarding generalized performance. This was also six days before the potential completion of the Plaintiff's 180-day probation. This check-in was the equivalent of stating frustrations that were a product of her inability to set out an action plan, evidently being supervised by VP of Communications and Marketing Melissa Sorola. A reflection of her inability to receive proper direction within their hostile work environment. It is not clear as to why former Director of Communications Christine Patmon is no longer with the company. On the Zoom call, the Plaintiff told Christine Patmon, Director of Communications, that the

Plaintiff needed guidance and support that a leader should be willing to provide to new employees. However, she had rebuttals for all of the Plaintiff's remedies. Considering that the feedback was spontaneous and generalized, the Plaintiff left the call confused and belittled. No plan of action or follow-up steps were provided. The Zoom call closed out without direction. This spontaneous meeting occurred on the 172nd day of the Plaintiff's 180-day probation period. VP of Communications and Marketing Melissa Sorola failed to provide next steps and feedback. She simply commended former Director of Communications Christine Patmon on the nature of which she held the Zoom call.

39. On July 7, 2022, two days before completing the Plaintiff's 180-day probationary period, Former Director of Communications Christine Patmon, accompanied and supervised by assigned Sr. HR Generalist Jennifer E. Garza-Vasquez, provided the Plaintiff with a termination letter signed by former Director of Communications Christine Patmon for "not complying" with the security department's investigation and for "not meeting performance expectations" during the probationary period. It was now apparent that regardless of the two times, Sr. HR Generalist Jennifer E. Garza-Vasquez reassured the Plaintiff that there would not be adverse action for not complying with the security department as she requested, the Plaintiff would now, in fact, suffer adverse action (see Ex. 20).

40. The Plaintiff's termination letter lists several false policy violations differentiating in nature in a clear attempt to damage the Plaintiff's reputation and retaliate. The Plaintiff followed CPS Energy's policy and the exact instructions of Human Resources, which instructed that the Plaintiff deny providing the Security department with any medical documentation. However, the Plaintiff was still terminated for failing to cooperate with the Security Department's investigation, as listed on the termination letter (see Ex. 20).

15

41. Within the Plaintiff's 178 days at CPS Energy, no writeups and/or verbal/formal warnings were received, and the Plaintiff wasn't provided with any action plans or goals regarding performance. The Plaintiff's performance was exceptional given that he had the most published blogs and spokesperson interviews on behalf of CPS Energy within the Public Relations department.

42. During the Plaintiff's 178 days at CPS Energy, he was commended by colleagues for writing numerous blogs and for promptly providing quality Spanish translations. One blog that stands out notably received more than 7,011 views as of November 10, 2023, from CPS Energy's website alone. This blog featured Sr. HR Generalist Toni Rowland Harris (see Ex. 23), an individual the Plaintiff worked closely with on interviews regarding her career for Black History Month. Additionally, the Plaintiff's publications are still found within VIA buses and on billboards throughout San Antonio.

43. Prior to the termination date, it was never brought to the Plaintiff's attention that he was in violation of CPS Energy's General Workplace Policy, or any violations written in the termination letter. The Plaintiff was asked to report to CPS Energy Headquarters at 8 am and was terminated two months and 12 days after the misplacement of the ID badge.

44. On July 7, 2022, the Plaintiff filed for unemployment.

## VI.
## DISABILITY DISCRIMINATION PURSUANT TO 42 U.S.C. § 12112, THE AMERICAN WITH DISABILITIES ACT OF 1990, AS AMENDED

45. The evidence will show that:

   a. Plaintiff is disabled (actually disabled and/or "regarded as" disabled) due to his anxiety, depression, and PTSD,.which limited the major life activities of concentration and interaction;

16

    b.  Plaintiff was qualified for his position of Bilingual Communications Specialist 4;

    c.  Plaintiff suffered an adverse employment action in that he was terminated; and

    d.  The circumstances arising raise an interference of disability discrimination.

46. The evidence will also show the Defendant's reason(s) for taking adverse employment actions against Plaintiff's employment are pretextual.

47. The evidence will further demonstrate that other employees without disabilities and/or that were not regarded or perceived as disabled were treated more favorably than the Plaintiff.

## VII.
## RETALIATION PURSUANT TO 42 U.S.C. § 12203(a)
## THE AMERICAN WITH DISABILITIES ACT OF 1990, AS AMENDED

48. Further, Defendant, CPS Energy, retaliated against Plaintiff in violation of the American with Disabilities Act of 1990, as amended, 42 U.S.C. § 12203(a) by terminating Plaintiff's employment after Plaintiff made a protected complaint of disability discrimination to Defendant.

## VIII.
## DAMAGES

49. Plaintiff alleges that as a direct and proximate result of the conduct and/or omissions on the part of the Defendant, he is entitled to recover at least the following legal damages:

    a.  Lost wages, past and future

    b.  Compensatory Damages, including Mental Anguish, emotional pain, suffering, inconvenience and loss of enjoyment of life suffered in past, and which, in all reasonable probability, which will be suffered in the future;

    c.  Pecuniary losses;

    d.  Reasonable attorney fees, expert fees and costs;

    e.  Based upon the above enumerated damages, the plaintiff pleads for actual damages

for the above damage elements in an amount the jury deems reasonable. In addition, the plaintiff seeks equitable relief available under the statues.

## IX.
## ATTORNEY FEES

50. Defendant's conduct described in this petition and the resulting damage and loss to Plaintiff could potentially necessitate retaining counsel. Therefore, if applicable, Plaintiff seeks all reasonable and necessary attorney fees in this case which would include at least the following:

    a. Preparation and trial of the claim, in an amount the jury deems reasonable;

    b. Post-trial, pre-appeal legal services, in amount the jury deems reasonable.

## X.
## JURY DEMAND

51. Plaintiff demands a trial by jury.

## XI.
## PRAYER

52. **WHEREFORE, PREMISES CONSIDERED,** Plaintiff, Ruben Gabriel Betancourt, requests Defendant to be cited to appear and answer, and that on final trial, the plaintiff have judgement against Defendant as follows:

    a. judgement against Defendant, CPS Energy for Plaintiff, Ruben Gabriel Betancourt as follows: actual damages, including lost wages and benefits (both front and back pay and/or equitable relief to include reinstatement, if feasible);

    b. judgement against CPS Energy for compensatory damages in the maximum amount allowed by law;

    c. pre-judgement and post-judgement interest at the maximum allowed by law;

    d. costs of suit, including attorneys' fees; and

e.  such other and further relief, both at law and in equity, to which the Plaintiff may be

justly entitled.

Ruben Gabriel Betancourt
Petitioner Pro Se
12305 SW Loop 410 Apt 13210
San Antonio, TX 78224
210-577-5959
Email: rubengabe2023@gmail.com

EXHIBIT 1

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**San Antonio Field Office**
5410 Fredericksburg Road, Suite 200
San Antonio, TX 78229
(210) 640-7530
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 08/17/2023

**To:** Ruben G. Betancourt
8010 Aeromedical Road Apt 6304
San Antonio, TX 78235

Charge No: 451-2022-02075

EEOC Representative and email:    LIDIA TORRES
Federal Investigator
lidia.torres@eeoc.gov

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is the official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 451-2022-02075.

On behalf of the Commission,

Norma J. Guzman
for    Field Director

Cc:
**CPS ENERGY**
c/o David Rivela
500 Mccullough Ave
P.O. Box 1771
San Antonio, TX 78215
drivela@cpsenergy.com

**CPS ENERGY**
c/o Christine E Reinhard
Schmoyer Reinhard LLP
8000 W Interstate 10 Ste 1600
San Antonio, TX 78230


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 451-2022-02075.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

### Notice Of Rights Under The ADA Amendments Act OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

- ✓ **Only one** major life activity need be substantially limited.

- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.

- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

Enclosure with EEOC Notice of Closure and Rights (01/22)

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability. For moreinformation, consult the amended regulations and appendix, as well as explanatory publications, available at* http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability. For more information, consult the amended regulations and appendix, as well as explanatory publications, available at* http://www.eeoc.gov/laws/types/disability_regulations.cfm.



12/21/2021

Dear Ruben,

Congratulations! On behalf of CPS Energy, I am pleased to extend an offer to you for the position of Communications Specialist Bilingual 4. In this role, you will report to Christine Patmon, within our Communications. As discussed, your initial base pay will be $81,000 paid ratably on a bi-weekly basis. This is an exempt position and therefore you will not be eligible for overtime. Your starting date of employment is 01/10/2022.

Benefits include:
• Pension benefits after one full year of service;
• 80 hours of paid vacation annually (eligible after 180 days and upon completion of 1 year)
• Up to 12 holidays, (including one floating)
• Supplemental deferred compensation plan (457b);
• Health, dental, vision, life, and disability insurance plans
• Free parking
• 10 days of sick leave per year (eligible after 90 days)

Please report to our Headquarters on 01/10/2022 at 8:00AM for New Hire Orientation.

Please bring the following documents to your first day or orientation:
• Proof of eligibility to work in the U.S. for the I-9 form
• Photo identification
• Birth Certificate (s)
• A copy of your marriage certificate, if applicable
• Proof of insurance coverage if opting out of the CPS Energy Health Plan

CPS Energy provides free parking for all employees.  For onboarding and orientation, please park in the surface visitor lot located at 500 McCullough San Antonio, TX 78215 .  Please check in the front desk with your photo ID and tell security that you are a new employee.  Your work location will be at the Communications facility and reporting to Christine Patmon.
CPS Energy is a great place to work and we are confident you will become a valuable, enthusiastic member of our team.  Welcome to CPS Energy!

Sincerely,
Adrian Anderson
Talent Acquisition Team
CPS Energy

# EXHIBIT 3

**Baptist Medical Center**
111 Dallas Street
San Antonio. TX 78205-1230

| | | | |
|---|---|---|---|
| Patient: | BETANCOURT, RUBEN | Attending Provider: | MEZA MD,DOMINIC MARK |
| MRN #: | 3802747 | | |
| Account #: | 2210201107 | Admission Date: | 4/13/2022 |
| DOB/Age/Sex: | ▓ / ▓ / Male | Discharge Date: | |
| | | Lab Medical Director(s): | Jennifer R Rushton, M.D. |

---

## Discharge Documentation/Instructions

Document Type:                        IP Patient Depart Summary
Document Subject:                     Inpatient Discharge Instructions
Document Date/Time:                   4/14/2022 10:47 CDT
Document Status:                      Auth (Verified)
Performed By:                         Bizau RN,Maria (4/14/2022 10:47 CDT)
Authenticated By:                     Bizau RN,Maria (4/14/2022 10:47 CDT)

# BETANCOURT, RUBEN

**MRN:** 3802747
**Phone Number:** 2109953412
**Address:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓4

**FIN:** 2210201107
**Weight kg:** 96.5 kg
**Document Created:** 04/14/2022 10:47:20

# Patient Discharge Instructions

Baptist Medical Center would like to thank you for allowing us to assist you with your healthcare needs. The following includes patient education materials and information regarding your injury/illness.

Your test results and important health information are available online on My Health Rec. If you did not sign up for My Health Rec during your visit, please go to the hospital website to enroll. The first step is to create a My Health Rec account. Once you create an account, you will be able to use other online applications to manage your health information. When you use an online application, it will sign in to your secure My Health Rec account. Call 1-888-252-8149 if you need help with My Health Rec. If you have questions about medicines or health concerns after going home from the hospital, please call your doctor's office.

## Discharge Orders

| Order Name | Order Details |
|---|---|
| Discharge Patient | Discharge To: Home<br>Discharge Diet: Regular Diet<br>Discharge Activity: Progressive Ambulation, every 1 hour<br>Special Instructions: Follow up with surgeon, Dr. Garcia in 10 days, call for appointment |

## Primary Care Provider

Name:

Report Request ID:  407950074

Printed:  4/14/2022 10:47 CDT

**Baptist Medical Center**
111 Dallas Street
San Antonio, TX 78205-1230

Patient: BETANCOURT, RUBEN
MRN #: 3802747
Account #: 2210201107
DOB/Age/Sex: ~~██████████~~ ~~██~~ / Male

Attending Provider: MEZA MD,DOMINIC MARK
Admission Date: 4/13/2022
Discharge Date:
Lab Medical Director(s): Jennifer R Rushton, M.D.

*Discharge Documentation/Instructions*

Phone:

# Advance Directives

Advance Directive -
  No
Advance Directive Additional Information -
  Pastoral care/social services visit request

# Reason for Your Visit

Acute Appendicitis

## Your Diagnosis

Acute appendicitis
Abdominal pain, acute
Benign hypertension
Abdominal pain*

# What to do next

## You Need to Schedule the Following Appointments

**Follow Up with** GARCIA MD,
ANDREA, Surgery
**When** Within 10-14 days

**Why:** Call for follow-up appointment
**Where:** 7940 FLOYD CURL DRIVE SUITE 620
SAN ANTONIO, TX 78229-
(210)614-7300

**Follow Up with** Follow up with
primary care provider
**When** Within 5 to 7 days

**Why:** Call for follow-up appointment
**Where:**

**EXHIBIT 4**

St Luke's Surgical Care , 7940 Floyd Curl Dr , STE 620, SAN ANTONIO TX 78229-3774

BETANCOURT, Ruben (id #2846367, dob: 06/18/1989)



## ST. LUKE'S
### SURGICAL CARE

### PATIENT RETURN TO SCHOOL/WORK FORM

SATX_ST LUKES SURGICAL CARE
7940 Floyd Curl Dr. ,STE 620
**Phone:**(210) 614-7300
**Fax:**(210) 614-7313

**Patient Name:** BETANCOURT, RUBEN

**DOB:** ▓▓▓▓▓▓

**Patient Address:** 8010 AEROMEDICAL RD/APT 6304
SAN ANTONIO, TX 78235-0004

The above named patient was under my care on: 4.12.22

He/She will be able to return to work/school on: 4.18.22

[ ] Has been examined, found to be in good physical health, and may participate in all school, sports, and camp activities

[ ] Is no longer contagious, and may return to all activities

[ ] Please excuse from: School / Work / Gym / Sports for _____ days/ weeks.

**Clinician Comments:**

no lifting over 20lbs For six weeks

_Andrea Garcia_  NRCMA

Andrea Garcia, MD
DATE PRINTED: **05/04/2022**

BETANCOURT, RUBEN 06/18/89 #2846367



* 79360165w1438   Admin

28 - A



EXHIBIT 5

## General Workplace Security Policy

**Background Investigation/Personal Risk Assessments:**

Employees must successfully pass CPS Energy's background investigation/personal risk assessment (BI/PRA) check and a drug test (in accordance with CPS Energy's Employment Policy) as part of the pre-employment screening process.

Prior to gaining unescorted access to CPS Energy facilities, systems or information, Contractors must successfully pass the BI/PRA conducted by a credentialed background screener retained by the contractor's employer. Additionally, the contractor's employer is required to provide an attestation letter certifying that each of their employees that will be providing services for CPS Energy successfully passed the BI/PRA. Additional details are included in applicable procedure(s) and guideline document(s).

The owner of a NERC facility or system will determine if an employee or contractor obtains NERC physical or cyber access. Additional details are included in the NERC Access Control procedures.

Contractors requiring NERC access must successfully pass CPS Energy's BI/PRA criteria.

Additionally, prior to being granted NERC access to cyber, physical and/or information, employees and contractors must also successfully complete CPS Energy's approved Cyber Security NERC training.

**Issuance of Identification and Visitor Badges:**

New employees shall be issued a physical access/identification badge by Security Operations as part of the orientation and on boarding process. All employees requiring cyber access will be granted authorization in accordance with CPS Energy's Enterprise Information Technology Security processes.

Contractors shall be issued a physical access/identification badge if the business unit or area requires them to have unescorted access to CPS Energy facilities, systems or information. Contractors shall remit a nominal fee for an access/identification badge(s) that covers the cost of purchasing, printing, and administering the issuance of the badge.

Visitors shall be issued a visitor badge prior to entering CPS Energy Facilities. At a minimum, the person designated to issue the visitor badge shall properly record the visitor's name, date and time of issuance of the visitor badge, and purpose of the visit. The time the visitor exits the CPS Energy facilities shall also be recorded immediately upon departure.

Security Operations may approve temporary access/identification badge procedures for specific CPS Energy Facilities based on business needs.

**Lost or Stolen Access/Identification Badges:**

Employees, contractors, and visitors shall immediately report any lost or stolen access/identification or visitor badge to Security Operations and shall remit a fee for any replacement badge that must be re-issued.



Quote this → Paid $10 for Badge

appendix D release

Scanned by TapScanner

CPS ENERGY, Post office Box 1771, San Antonio, Texas 78296-1771

| Name...... Ruben Betancourt | Pay Type....CPS Regular Bi-Week |
|---|---|
| Pers.no... 00103258  Pay Rate 38.94231 | Pay Per.13/2022 06/12/2022 -06/25/2022 |
| Vacation..      0.00 | Fil.Status:  00 |

| Check date | Check number | Chk amount = | Gross | – | Taxes | – | Deds. |
|---|---|---|---|---|---|---|---|
| 07/01/2022 | 00103258000130 | 2,424.72 = | 3,115.39 | | 626.55 | | 64.12 |

## EXHIBIT 6

| | | | | |
|---|---|---|---|---|
| Regular Pay | | 72.00 | 2,803.85 | 33,801.90 |
| 1210  Holiday | | 8.00 | 311.54 | 1,246.16 |
| 1215  Sickness | | | | 623.08 |
| 1255  Admin leave | | | | 1,713.47 |
| Total gross | | | 3,115.39 | 37,384.61 |

| TAXES | Current | Yr.to date |
|---|---|---|
| /401  TX Withholding Tax | 393.13 | 4,720.79 |
| /403  TX EE Social Security Tax | 189.18 | 2,268.69 |
| /405  TX EE Medicare Tax | 44.24 | 530.58 |
| Total taxes | 626.55 | |

| TAX-EXEMPT DEDUCTIONS | Current | Yr.to date |
|---|---|---|
| /190  Health Pre-Tax | 64.12 | 769.44 |
| 2305  Life Pre Tax | | 23.40 |
| Total: | 64.12 | |

| DEDUCTIONS (NOT TAX-EXEMPT) | Current | Yr.to.dt |
|---|---|---|
| 2306  Life Post Tax | | 87.36 |
| 2615  Badge Replace | | 10.00 |

EXHIBIT 7

## **One-Party Consent Audio Recording Transcription**

**Ruben Betancourt:** "Uh…what actually, what documents are you requesting because I do have…uh…the surgery discharge paperwork or are you requesting like a full list from my doctor's office?

**Investigator Jonathan Herring:** "So…requesting…uh…a list of the medications prescribed to you by doctor or doctors that you…uh… you were taking."



EXHIBIT 8

## One-Party Consent Audio Recording Transcription

**Ruben Betancourt:** "Like, why is this paperwork needed? Is it for research purposes or is it for filing purposes? Like, what's going on? I...I feel like I have the right to know.

**Manager of Security Operations Vanessa Hurtado:** "Well, this is an open investigation, so right now we are...this isn't a concluded investigation, so in order to understand you're, what you're taking, what medication you were prescribed is part of the investigation."

**Ruben Betancourt:** "Ok"



**EXHIBIT 9**

## One-Party Consent Audio Recording Transcription

**Ruben Betancourt:** "Is there anyway you can provide me with that contact—in Human Resources?

**Manager of Security Operations, Vanessa Hurtado:** "Just reach out to your HR Rep, your people and culture rep for this...for that."



EXHIBIT 10

## One-Party Consent Audio Recording Transcription

**Ruben Betancourt:** "I remember you mentioning that Human Resources was going to request this information. I haven't heard anything from Human Resources, just, Jonathan called me yesterday...so I'm just questioning, have they been notified?"

**Manager of Security Operations Vanessa Hurtado:** "Yes! So Human Resources is, uh, involved. They informed us to give you a...basically request the information.



EXHIBIT 11

## One-Party Consent Audio Recording Transcription

**Investigator Jonathan Herring:** "Hello."

**Ruben Betancourt:** "Hello, yes, can I speak with Jonathan.

**Investigator Jonathan Herring:** "This is Jonathan."

**Ruben Betancourt:** "Hey, Jonathan, it's Ruben Betancourt. How are you?

**Investigator Jonathan Herring:** "Hey, good, how are you?"

**Ruben Betancourt:** "I'm doing good. I don't feel very comfortable in giving that to, like…I mean it's private and sensitive information, so I, I mean, do you have a point of contact?

**Investigator Jonathan Herring:** "Um, yeah, can you hold for one second?

**Ruben Betancourt:** "Sure."

**Investigator Jonathan Herring:** So, I can get that.

**Ruben Betancourt:** "Sure."

**Investigator Jonathan Herring:** I'm going to put you on…on a hold, okay.

**\*Placed on Hold\***

**Investigator Jonathan Herring:** Hey Ruben, can you hear me?

**Ruben Betancourt:** "Yes, I can hear you."

**Investigator Jonathan Herring:** Can you hear me, ok?

**Ruben Betancourt:** "Yes."

**Investigator Jonathan Herring:** Hey, I just asked my manager Vanessa Hurtado to step into the room. She was the one that was in there when we spoke last week.

**Ruben Betancourt:** "Right."

**Manager of Security Operations Vanessa Hurtado:** "Hi Ruben, so, uh, I just wanted to uh, so you had a question, or you wanted clarification.

**Ruben Betancourt:** "Yes, I did want clarification."

**Manager of Security Operations Vanessa Hurtado:** "Um, so security is asking for you to, to provide this information. We have an open investigation, um, we gave you a deadline to provide it, so I would highly suggest providing that."



EXHIBIT 12

**One-Party Consent Audio Recording Transcription**

**Ruben Betancourt:** "Hello."

**Sr. HR Generalist Jennifer E. Garza-Vasquez:** "Hi Ruben this is Jennifer Vasquez returning your phone call."

**Ruben Betancourt:** "Hi Jennifer."

**Sr. HR Generalist Jennifer E. Garza-Vasquez:** How are you?

**Ruben Betancourt:** "Good, good. I appreciate you calling me back. I know we have been playing phone tag for the longest time. But I...um.

**Sr. HR Generalist, Jennifer E. Garza-Vasquez:** "Yeah."

**Ruben Betancourt:** "...um I just wanted to ask you a question. So, the security department is um said they opened an investigation and they spoke to HR and that HR ...um...relayed the information and saying that they need to request a list of my medications. Does, do you show anything on my account showing that there's an investigation? Ongoing investigation...or a request of the list?

**Sr. HR Generalist Jennifer E. Garza-Vasquez:** "I am unaware of anything like that going on. Um."

**Ruben Betancourt:** "Yeah."

**Sr. HR Generalist Jennifer E. Garza-Vasquez:** "I mean everything that comes through... that it's gonna be about...about you is coming...if it's an HR concern, they should loop me in as the generalist for Corp Comm and for you."



EXHIBIT 13

## <u>One-Party Consent Audio Recording Transcription</u>

**Ruben Betancourt:** "So what do I do about like their...their deadline? Am I okay with just informing you? or…

**Sr. HR Generalist Jennifer E. Garza-Vasquez:** "Yes, you're going to work with me going forward.

**Ruben Betancourt:** "Okay, okay, perfect."

**Sr. HR Generalist Jennifer E. Garza-Vasquez:** Yeah…work with me. Don't provide them any information especially since they're asking for medical documentation. Everything on a medical side. Um you know with our HIPPA Laws they need to go to our lead team."

**Ruben Betancourt:** "Right. Exactly. Exactly"



EXHIBIT 14

## <u>One-Party Consent Audio Recording Transcription</u>

**Investigator Jonathan Herring:** "So my next step is to follow back up with HR which who I've been discussing the investigation with. So, I just wanted to make sure you are aware of that.

**Ruben Betancourt:** "...of course."

**Investigator Jonathan Herring:** "...and I'm going to provide—and legal—and so I'm going to provide them the information that you are declining...uh...to provide this at this time. Just so you know, Okay?

**Ruben Betancourt:** "I'm not declining, Human Resources relayed this information to you.... I'm sorry...to me and that's why I'm relaying it to you. So, thank you, you have a nice afternoon.

**Investigator Jonathan Herring:** "I'm sorry...do what?

**Ruben Betancourt:** "HR is going to contact ya'll because this is a HIPPA violation. So, I...moving forward Jennifer instructed me that I will be working on this investigation with her. So, I'm not denying anything.

**Investigator Jonathan Herring:** "Ok."

**Ruben Betancourt:** "But, I'm just following the instructions my generalist told me.

**Investigator Jonathan Herring:** "Ok, just so we are clear we have been in contact with HR and legal and they have been involved in this investigation."



## FW: Urgent Information   Inbox ×                **EXHIBIT 15**

**Betancourt, Ruben** <rbetancourt@cpsenergy.com>                                        Wed, May 4, 3 51 PM

to me

**From:** Betancourt, Ruben
**Sent:** Wednesday, May 4, 2022 3:48 PM
**To:** Garza-Vasquez, Jennifer E <JEGarza-Vasquez@cpsenergy.com>
**Subject:** Urgent Information

Jennifer,

I spoke to Jonathan after our initial phone call today, and he told me that If I don't submit my medical information by EOD, then I am refusing to cooperate. He insinuated there would be consequences for me refusing to turn in my medical information. He then mentioned that legal was involved. I want to make sure there won't be any actions for not submitting my list of medications to the Security Department. And unfortunately, these scare tactics are working, causing anxiety about my career and livelihood. I'm having my fiancé drive me to a clinic because I'm having trouble breathing with my anxiety rising. I apologize for all of this.

Thank you!

## Ruben Betancourt

Bilingual Communications Specialist| Corporate Communications & Marketing
CPS Energy | 500 McCullough  San Antonio, Texas 78215
Facebook: @CPSEnergy  |  Twitter: @cpsenergy  |  Instagram: @cps_energy | #cpsenergy
Mobile: 210-793-4752
www.cpsenergy.com

...

**EXHIBIT 16**
**Betancourt , Ruben G**

**Texas MedClinic** ✚
*For Life's Little Emergencies*

8E4560252

| AGE | SEX | M-STAT | DOB | SSN | PREV VIS | DOS | | E-PHI | RM# |
|---|---|---|---|---|---|---|---|---|---|
| | M | S | | | 4/10/2022 | | | N | A6 |

Time 309
Tech Initial FS

| GUARANTOR | | LIFE | | | CARRIER |
|---|---|---|---|---|---|
| Ruben Betancourt | | HMO PPO | | | Blue Cross Blue Shield Of Texas |

| Chief Complaint | Panic attack, chest pain, feeling sick |
|---|---|
| Med Allergies | None |
| Medications | Wellbutrin,lisinopril,lexapro,adderral  , Ibuprofen, Motrin, Advil, Lisinopril |
| Problem List | Seasonal Allergies, Kidney Problems, depression anxiety , ADHD, PTSD, PSH: Gallbladder, Appendix. |

| LAST TETANUS Unknown | PREG? NA | FDLMP NA | DOI | APPT | APPT DR | | |
|---|---|---|---|---|---|---|---|
| | | | | | Correction MA | | RECORDED |
| | | | | | fsliva1 | | 5:09 pm |

| TEMP °F | BP | BP Pos | PLS | RESP | PLS Ox % | HT | WT | BMI | OD | OS | OU | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 98.5 | 133/95 | sitting | 103 | 97 RA | | | | | | | | |

**HISTORY OF PRESENT ILLNESS**

*(handwritten notes)*

| | |
|---|---|
| Const: | VS, Appearance |
| Eyes: | Lids, Conj, Pupil, Fundus, Cornea |
| ENT: | Auricle, EAC/TM, Hearing, Pharynx, Nares |
| Neck: | Mass, Thyroid |
| Resp: | Effort, Rales, Rhonchi, Wheeze |
| CV: | Rate, Rhythm, Murmur, Distal Pulses, Edema |
| Abd: | BS, Tender, HSM, Umb/Vent Hernia, CVAT |
| MS: | Gait, Inspection, ROM, Strength |
| Lymph: | Neck, Axillary |
| Derm: | Rash, Induration |
| Neuro: | CN, DTR, Sensation, Romberg |
| Psych: | Ox3, Judge/Insight, Memory, Mood/Affect |

Normal  (Abnormal)  Unmarked = Not Examined

Charge Entry By _____

EL. 6

**ORDERS**   RESULTS

12 lead EKS - ✓

EL.

| DIAG #1 Anxiety | DIAG #3 | 99214 |
|---|---|---|
| DIAG #2 | DIAG #4 | |

| | | FOLLOW UP INST |
|---|---|---|
| ☐ RTC or ED if no imprvmt. | ☐ RTC in | *(handwritten)* |
| In ___ to ___ hrs | ___ days | |
| ☐ F/U w/PCP in ___ days | ☐ Rx to Pt | |
| ☑ F/U instr given to Pt | ☒ Rx faxed | |

Cro

DOCTOR SIGNATURE

DOCTOR NAME JOHN LEHEW, D.O.

RECP INITIALS

TIME OUT 1793

**Betancourt , Ruben G**

1111 Southeast Military Drive  San Antonio, TX 78214-2801  Phone (210) 927-5580  Fax (210) 927-2700



# VISIT SUMMARY REPORT

| Patient Information | Name Betancourt, Ruben | | Social Security # |
|---|---|---|---|

| Doctor / Clinic Information | Doctor | Lehew DO, John | Date Of Service | 05/04/2022 |
|---|---|---|---|---|
| | Chart # | SE6560252 | | |
| | Phone | (210) 927-5580 | Fax | (210) 927-2700 |
| | Address | 1111 Southeast Military Drive, San Antonio, TX 78214-2801 | | |

## DIAGNOSIS

| F41.0 | Anxiety / Panic Disorder |
|---|---|

## PROCEDURE CODES

| 99214 | Follow-Up Visit - Detailed |
|---|---|
| 93000 | EKG (12 Lead) with Interpretation |

## PRESCRIPTIONS

| Drug Name | Dose | Dispense | Refills | Doctor | Date/Time |
|---|---|---|---|---|---|
| Hydroxyzine HCl | 25 mg tablet | 20 | 0 | John Lehew | 5/4/22  5:41 pm |

## RX - TRANSMISSION LOG

| Drug Name | Pharmacy | Transmitted By | Date/Time |
|---|---|---|---|
| Hydroxyzine HCl | HEB #21 SE Military & Goliad | John Lehew DO | 5/4/22  5:41 pm |

Rx Electronically Sent.

9/6/22  12:19 pm

EXHIBIT 17

<u>**One-Party Consent Audio Voicemail Recording Transcription**</u>

**SR. HR Generalist Jennifer E. Garza-Vasquez:** "Hi Ruben, thank you so much for being patient. Um…I did just see your email come through. Um…No. You do not have to send it over to Security. I did speak to the Interim manager of our occupational health, and you can send your information for medication to him. So, it's Jorge Vasquez, he's again the Interim Manager. His email is jvasquez4@cpsenergy.com. And then he will review your information. He's more than likely going to give you a call back wanting to know if the Dr. submitted what's called a Fitness for Duty to see if you had any type of restrictions or anything after you had your surgery. Um…if you have any questions let me know again. He is the right person to send your information to. You do not have to send anything to security. You are doing everything you need to do by me letting you know that this is the route to go. So, if you have any questions, Jennifer I can be reached again at 210-429-4878. Thank you."



# EXHIBIT 18

### FW: Requested Medical Information-Betancourt    Inbox ×

**Betancourt, Ruben** <rbetancourt@cpsenergv.com>                                              Thu, May 5, 9:53 AM
to me, sionedjacob@gmail.com

From: Betancourt, Ruben
Sent: Thursday, May 5, 2022 9:48 AM
To: 'jvasquez4@cpsenergy.com' <jvasquez4@cpsenergy.com>
Subject: Requested Medical Information-Betancourt

Good morning Jorge,
Here's my medical information requested by Jennifer Garza-Vasquez. I've also included the new medication I was prescribed yesterday. Please let me know if you have any additional
questions.

Thank you!


## Ruben Betancourt

Bilingual Communications Specialist| Corporate Communications & Marketing
CPS Energy | 500 McCullough  San Antonio, Texas 78215
Facebook: @CPSEnergy  |  Twitter: @cpsenergy  |  Instagram: @cps_energy | #cpsenergy
Mobile: 210-793-4752
www.cpsenergy.com


**5 Attachments**

# EXHIBIT 19

## Formal Complaint     Inbox ×

**Betancourt, Ruben** <rbetancourt@cpsenergy.com>                    Thu  May 5  1 34 PM
to Jennifer

Jennifer,

I need to file a formal complaint against **Jonathan Herring and Vanessa Hurtado** for:

Action 1- Deeply questioning my medical history during their interrogation.
Action 2- Harassment regarding the multiple phone calls requesting me to take in a list of medications to the corporate office.
Action 3- Demanding an entire list of medicinal history on paper and asking me to disregard the direction of Human Resources.
Action 4- Insinuating that there would be consequences for not complying with their demands and utilizing the involvement of CPS Energy's Legal team as a scare tactic.

They tried numerous times to violate my HIPPA rights by using scare tactics to obtain a list of my medications via phone calls. They also told me that Human Resources had directed them to request my medical history for their investigation. Which we know is not the case after speaking with you. Their actions toward me are unfortunate and have caused emotional distress. The unwanted exposure of my mental illnesses and medications has made me feel embarrassed, belittled, and have caused much anxiety about my new career here at CPS Energy of three months.

Thank you.

# EXHIBIT 20



**In Person & 1st Class and Certified Mail**

July 7, 2022

Ruben Betancourt
8010 Aeromedical Road Apt 6304
San Antonio, TX 78235

Dear Mr. Betancourt:

This letter is to inform you that your employment with CPS Energy is terminated effective today, July 7, 2022. This decision is based on violations of CPS Energy policies during your probationary period of employment as set out in the Employment Policy. You were not forthcoming, truthful and accurate in your report to security operations, which created an escalated security concern and is a violation of the Civil Behavior Policy. It was determined upon further review of this issue that you failed to safely perform your work duties, failed to safeguard your badge as a critical security device and failed to show cooperation during the course of an investigation, which are in violation of CPS Energy's General Workplace Security Policy. Your performance during the probationary period also has not risen to the level of expectations for which you were hired.

In accordance with CPS Energy policy, you are required to return your employee badge and other CPS Energy property that is currently in your possession.

Your termination has no impact on any workers' compensation or disability benefits. Information regarding your health benefit and retirement options will be mailed to your home, or you may contact Employee Benefits at (210) 353-2900.

Sincerely,

Christine Patmon
Christine Patmon
Director, Corporate Communication

cc: Personnel File

500 McCullough Ave/P.O. Box 1771        San Antonio, Texas 78215-1771        (210) 353-2000

EXHIBIT 21

55 A

UI Support & Customer Service
TEXAS WORKFORCE COMMISSION
PO BOX 2211
MC ALLEN TX 78502-2211

# EMPLOYER
## DETERMINATION ON PAYMENT OF UNEMPLOYMENT BENEFITS
Date Mailed:  August 4, 2022

CITY PUBLIC SERVICE BOARD
CPS ENERGY
HUMAN RESOURCES, MAIL DROP 100101
PO BOX 1771
SAN ANTONIO TX 78296-1771

Individual:  **RUBEN G BETANCOURT**
Social Security Number: ████████
Employer:  CITY PUBLIC SERVICE BO
Employer Account No.:  99-991548-5
All dates are shown in
month-day-year order.

---

### Decision

We sent this decision on entitlement to Unemployment Benefits to the individual on this date.

**Issue:** Separation from Work
**Decision:** We can pay you benefits, if you meet all other weekly requirements, such as being able and available to work, and be actively searching for work.
**Reason for Decision:** Our investigation found that your employer fired you for a reason that was not misconduct connected with the work.
**Law Reference:** Section 207.044 of the Texas Unemployment Compensation Act.

#### Understanding your Decision

TWC monitors eligibility for benefits when a claimant first files a claim for unemployment insurance and every time weekly payments are requested.  TWC has made a decision about this claimant's job separation or ongoing eligibility for UI benefits
- If you disagree with this decision, file an appeal.  Appeal each decision separately by the appeal deadline.  If you fax your appeal, retain a copy of the confirmation sheet.
- A claimant can dispute or appeal a "we cannot pay you benefits" decision.  TWC will notify you of the appeal hearing.  Failure to participate may result in an adverse decision.
- Be aware that you may receive additional or revised decisions for the same claim.
- If you have questions, call the TWC Tele-Center handling your claim.

---

### Determination of Employer's Potential Chargeback

We will bill the employer's account.

---

### If You Disagree with this Decision

If you disagree with this decision, you may appeal. Submit your appeal by fax, mail or online on or before  08-18-22
TWC will use the postmark date or the date we receive the fax or online form to determine whether your appeal is timely.
If you appeal by fax, you should keep your fax confirmation as proof of transmission.  Please include a copy of this notice with appeals correspondence. You must appeal each determination separately.

Mail the appeal to:

| | |
|---|---|
| You may appeal by submitting TWC's online appeal form. Go to www.texasworkforce.org | Appeal Tribunal<br>Texas Workforce Commission<br>101 E. 15th Street<br>Austin, TX 78778-0002<br>Or fax to: 512 475-1135 |

See Reverse For How To File An Appeal.

Case No.:  1
Claim ID.:  07-03-21
Claim Date:  07-03-22
HEARING IMPAIRED CLIENTS
CALL 7-1-1 Relay Texas

BD630E 06/28/2013

EXHIBIT 22

## One-Party Consent Audio Recording Transcription

### Starts at 0:51 Due to Preparation Time

**CPS Energy Compliance Officer:** "Good, good. Hi, Ruben."

**Ruben Betancourt:** "Hello, good morning."

**CPS Energy Compliance Officer:** "Can you hear me, ok?"

**Ruben Betancourt:** "Uh, yes, I can hear you."

**CPS Energy Compliance Officer:** "Ok, so Ruben, Michelle's with us also. Um, what I kind of wanted to do, Michelle's in our group, um, I wanted to just give you a high-level closeout of what our review of the situation was. You had presented a concern regarding your treatment by security during a recent investigation."

**Ruben Betancourt:** "Mm-Hmm."

**CPS Energy Compliance Officer:** "Um, I wanted to thank you for bringing this to our attention or bringing this forward and let me know that we take all concerns very seriously."

**Ruben Betancourt:** "Right."

**CPS Energy Compliance Officer:** "We reviewed the situation, and we did find some things that we thought were kind of like, I would say, process improvements or some recommendations for the business area. I'll tell you Ruben, and walking through this, the biggest thing here that I found was a lack of communication, um, between the two HR generalists, security was working with HR, their specific HR generalist. They were also working with legal and also working with, you know, nursing on how to resolve the situation.

And what happened was when you called your generalist and she wasn't aware of the situation and told you not to send anything, that just kind of really, you know, threw up a lot of confusion. And if I were to do like an after-action review or like a root cause analysis, I really do think that was the root cause in this whole case. Um, another thing that probably could have been a process improvement that would've helped was instead of like security telling you just to go into the main office and explain to where nursing was."

**Ruben Betancourt:** "Right."

**CPS Energy Compliance Officer:** "If they would've maybe had like a name of a person, a phone number, and an email, and if they could afford that onto you."

**Ruben Betancourt:** "Right."

**CPS Energy Compliance Officer:** I think that would've been helpful. And what we did do was we did share this information with the, uh, leadership. We met with both HR, and we met with security, and we kind of explained that those two, you know, issues probably created some concerns. So, we went through, and we did explain that to them and they're taking that back as process improvements that they can work on going forward. So, this doesn't happen again. Now, in reviewing this situation, we do not feel that any of the actions taken by security were inappropriate.

Also, we just wanna make sure that you understand that our review will not influence or affect any potential outcome of the security investigation. We were just looking at your concerns and what you, you know, had brought forward.

So again, we did find some things that we thought were process improvements and that, you know, again going forward could be improved to help, uh, alleviate any concerns. But again, I do think the biggest issue here was the the, like I said, lack of communication between the HR generalists. And then, like I said, maybe if they could provide you a contact information, it might've went a little smoother, but I don't feel there was anything that they did was inappropriate during the investigative process.

**Ruben Betancourt:** "Ok."

**CPS Energy Compliance Officer:** "Did you have any questions or anything? Well, first, Michelle, is there anything you wanted to add? Any additional information?"

**Compliance Team Member Michelle:** "Uh, no. You covered it."

**CPS Energy Compliance Officer:** "Okay. Ruben, did you have any questions?"

**Ruben Betancourt:** "Um, no. I mean, I, I don't have any questions."

**CPS Energy Compliance Officer:** "And like I said, understand, we, we did find a couple things and you know, it was reviewed with their leadership. So, the understanding that going forward, you know, we can try to avoid something like that in the future. But again, they're conducting an independent investigation, and we will have no bearing on the results of that investigation. Okay?"

**Ruben Betancourt:** "Ok. Alright, sounds good. I appreciate ya'll."

**CPS Energy Compliance Officer:** "Ok, thank you sir."

**Ruben Betancourt:** "Thank you. You have a good day."

**CPS Energy Compliance Officer:** "You too, bye-bye."



11/10/23, 6:34 PM

Case 5:23-cv-01435-FB    Document 8    Filed 11/16/23    Page 51 of 62
Black History Month: HR Professional's racial experiences lead to a compassionate and fulfilling career - CPS Energy Newsroom

EXHIBIT 23



Latest: Family drives Air Force Veteran to

f  X  ⊙  ▶  in



CPS Energy Homepage





BLOG

# Black History Month: HR Professional's racial experiences lead to a compassionate

# and fulfilling career

📅 February 23, 2022  👤 Ruben Betancourt  👁 7011 Views  💬 1 Comment

🏷 Black History Month, CPS Energy, San Antonio  ⏳ 4 min read

Jumpstarting a career at CPS Energy provides the opportunity to use your skills and talent to provide an essential service for our community and make a difference in the lives of more than two million people living in Greater San Antonio. Professionals like Toni Harris-Rowland, a Senior Human Resources Generalist, are focused on creating a welcoming environment and culture for our new team members. Her life experiences led her into a compassionate career where she found her calling at a young age.

Toni was born into a military family and lived overseas for most of her childhood. She is a proud first-generation Hispanic, Black woman. Her father is Barbadian, and her mother is from the Dominican Republican. At a young age, she noticed that as a minority she was subject to prejudice.

"Being of a racial minority in a foreign country and dealing with racial issues and seeing the different ways people look at you when you are American and when Americans look at you when you are a racial minority – (this experience) had an impact on how I look at the world and how I look at my role in our larger society. This is what led me to help people with issues of inclusion and diversity," said Toni.

Thankfully, these views didn't hinder her. They strengthened her resolve to make a difference.

A Strong Diversity, Equity, and Inclusion Background

After majoring in Human Resources and minoring in Computer Science, Toni opted to take an IT position. She created banking programs and digital assimilations for the military. But she still yearned to start helping marginalized communities.

Toni soon left the IT field and began making an impact on youth. Toni started helping underserved high school and college students, working with numerous organizations, including educational institutions, juvenile justice systems, and national businesses. During years of hard work and dedication, she raised awareness to bridge the inequality gap and accessibility.

Soon enough her skills in diversity, equity, and inclusion expanded tremendously and Toni was called on to help an entire Texas community overcome hardships caused by a high war deployment rate. At the start of Desert Storm 1, students in Killeen had their family lives thrown into a tailspin with the deployment of one or both parents. This instability caused an increase in violence and discrimination among students at Killeen ISD.

Case 5:23-cv-01435-FB     Document 8     Filed 11/16/23     Page 53 of 62

Toni worked as a consultant for the now-National Conference for Community and Justice; an organization created in the 1920s dedicated to bringing diverse people together to address interfaith divisions.

"I worked with (the community) and the school district to provide community reclamation and started community-based discussions on race and gender and how we can create an inclusive environment. A lot of times, economic and social stresses bring those underlying fractures to the surface," said Toni.

Her contribution in supporting this community was greatly appreciated and she was soon recognized by III Corps and Fort Hood.

Toni's work has taken her to places where she's shared the stage with people like Caroline Kennedy and Benjamin O. Davis Jr. She spoke at a conference where all three shared their expertise with CEOs of the top 10 businesses in our country at the time. In his twilight years, Davis who was a general and commander of the World War II Tuskegee Airmen, the first African American general in the U.S. Air Force, and had supported desegregation of the military, spoke about the social responsibilities that organizations and corporations hold as core entities drive social change.

His challenging words reassured Toni that she was on the right path and she was making a difference in utilizing her expertise within organizations by breaking down barriers for future generations.

"It's hard work and there's no immediate gratification. I'm passionate because I believe I'm changing the world, but I don't have to be there to see it happen," said Toni.

Today, Toni brings her valuable and numerous experiences to CPS Energy. She started out in HR, then as she has skillfully done throughout her career, took on a leadership role to stand up our Customer Response Unit (CRU) in 2014. Eight years later, CRU is known throughout our organization and in the community as a go-to customer solutions team.

Toni then returned to HR, now known as People & Culture, where she continues to go above and beyond in her role by ensuring people are managed fairly, equitably, and consistently. She continues to be a trailblazer as an active member of the American Association of Blacks in Energy (AABE), a national association of energy professionals dedicated to ensuring the input of African Americans and other minorities into the discussions and developments in the energy industry.

Her efforts are paving the way to help organizations recognize more minorities, such as women and nontraditional groups, who have the skillset for new roles. As a result, this powerful mission is breaking down barriers and providing skilled workers an inclusive environment that allows them to thrive and succeed. Undoubtedly, Toni's phenomenal work is making an impact now and for future generations! CPS Energy salutes Toni Harris-Rowland as we recognize Black History Month.

# Psychosomatic Institute of San Antonio

1636 Lockhill Selma Rd
San Antonio, TX 78213
Phone. 210-541-8455  Fax  210-541-9477
Web· www.psisatx.com

## Exhibit 24

09/06/2022

Subject: regarding unemployment

To: Whom It May Concern:

Mr. Ruben Betancourt (███████████, has been in my care from 01/28/2020 to present date. Patient has been under my care for treatment of mixed anxiety and depressed mood as well as ADHD. It was reported to me from Mr. Betancourt that while under my care he was under severe amounts of stress stemming from his employment that ultimately led to his release.

Any additional medical records needed can be requested from the clinic with the consent of the patient.

If any further information is required refer to the contact information above

Respectfully,

Ricardo Calderon, PMHNP-BC

Exhibit 25



GREEN MOUNTAIN
**COUNSELING**

**September 1, 2022**

To Whom It May Concern,

This letter is provided in support of Ruben Betancourt's (▬▬▬▬▬▬▬▬) submission for unemployment benefits and subsequent hearing on this matter. This individual has been in outpatient counseling services with the undersigned, in which the circumstances surrounding the investigation and termination have been of primary concern, and a significant source of psychological distress.

Mr. Betancourt has reported ongoing depressed mood, lack of sleep, and increased stress response due to the investigation, specifically from the lack of clarity from the investigation and job insecurity. While the details of the events cannot be confirmed by the undersigned, the emotional distress and traumatic response symptoms present have been witnessed, and have continued to have a significant impact in Mr. Betancourt's functioning.

The undersigned requests consideration for Mr. Betancourt's submission based on these factors, and if any additional information is needed in regards to treatment or recommendations of this therapist, please do not hesitate to contact me via the information below.

Sincerely,

John Jacobson, LPC, CCTP
Clinical Director
Green Mountain Counseling PLLC
12002 Warfield St, Ste 206
San Antonio, TX 78216
(210) 982-0872

EXHIBIT 26

## One-Party Consent Audio Recording Transcription

**Ruben Betancourt:** "I do have all my paperwork, a list of all my medications, even discharge paperwork, um, but I, I just don't feel comfortable releasing that information to them."

**Sr. HR Generalist Jennifer E. Garza-Vasquez:** "No. That is the right thing Ruben, um…"

**Ruben Betancourt:** "Yeah."

**Sr. HR Generalist Jennifer E. Garza-Vasquez:** "There is no, not a need to know for security to have that information."



## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

Ruben Gabriel Betancourt
_____

_____

_____

(Name of plaintiff or plaintiffs)

v.

Civil Action Number:

SA23CA1435FB
(Supplied by Clerk's Office)

CPS Energy
_____

_____

_____

(Name of defendant or defendants)

### COMPLAINT

1.    This action is brought by __Ruben Gabriel Betancourt__, Plaintiff, pursuant to the following selected jurisdiction:

### (Please select the applicable jurisdiction)

[ × ] Title VII of the Civil Rights Act of 1964 (42 USC §§ 2000e et seq.)  Employment Discrimination on the basis of race, color, sex (gender, pregnancy and sexual harassment), religion or national origin.

[    ] The Age Discrimination in Employment Act (29 USC §§ 621 et seq.) (**ADEA**).

[    ] The Americans With Disabilities Act (42 USC §§ 12102 et seq.) (**ADA**).

[    ] The Equal Pay Act (29 USC § 206(d)) (**EPA**).

[    ] The Rehabilitation Act of 1973 (29 USC §791 et seq.) (Applicable to federal employees only).

2.    Defendant _CPS Energy_____(Defendant's name) lives at, or its business is located at _500 McCullough Ave_____ (street address), _San Antonio_____ (city), _Texas_____ (state), _78215_____ (zip).

**28**

3a.     Plaintiff sought employment from the defendant or was employed by the defendant
        at 500 McCullough Ave _____(street address),
        (city), San Antonio, Texas _____(state), 78215 _____(zip).

3b.     At all relevant times of claim of discrimination, Defendant employed 501+ _____
        (#) employees.  If defendant is a union, at all relevant times of claim of
        discrimination, Defendant had _____ (#) members.

4.      Defendant discriminated against plaintiff in the manner indicated in paragraph 8 of
        this complaint on or about _____(month) _____(day) _
        (year).  If incidents of discrimination occurred more than one day, please indicate
        the beginning and ending dates of such acts: April 13, 2022-July 7, 2022 _____

5.      Plaintiff filed charges against the defendant with the Equal Employment
        Opportunity Commission (E.E.O.C.) charging defendant with the acts of
        discrimination indicated in paragraph 7 of this complaint on or about October _____
        (month) 28 _____(day) 2022 _____(year).  (Not applicable to federal
        civil service employees).

6a.     The E.E.O.C. issued a **Notice of Right to Sue** which was received by plaintiff on
        (month) August 17 _____(day) 2023 _____(year).  (Not applicable to
        ADEA and EPA claims or federal civil service employees).

**VERY IMPORTANT NOTE:**     **PLEASE ATTACH A COPY OF YOUR NOTICE OF
                             RIGHT TO SUE AND THE ENVELOPE IN WHICH
                             IT WAS RECEIVED TO THIS COMPLAINT.**

6b.     Please indicate below if the E.E.O.C issued a **Determination** in your case:

        [   ] Yes
        [ ✕ ] No

**VERY IMPORTANT NOTE:**     **IF YOU CHECKED "YES", PLEASE ATTACH A
                             COPY OF THE E.E.O.C.'S DETERMINATION TO
                             THIS COMPLAINT**

7.      Because of plaintiff's:

                        **(Please select the applicable allegation(s))**

        [   ]   Race (If applicable, state race) _____

        [   ]   Color (If applicable, state color) _____

[   ] Sex (gender, pregnancy or sexual harassment) (If applicable, state sex and claim)
[   ] Religion (If applicable, state religion) _____

[   ] National Origin (If applicable, state national origin) _____

[   ] Age (If applicable, state date of birth) _____

[ X ] Disability (If applicable, state disability) Anxiety, Depression, and PTSD _____

[   ] Prior complaint of discrimination or opposition to acts of discrimination.
       (Retaliation) (If applicable, explain events of retaliation) _____

       The defendant: **(please select all that apply)**

[   ] failed to employ plaintiff.

[ X ] terminated plaintiff's employment.

[   ] failed to promote plaintiff.

[ X ] harassed plaintiff.

[   ] other (specify) _____

8a.    State **specifically** the circumstances under which defendant, its agent, or employees discriminated against plaintiff **PERSONALLY:**

**VERY IMPORTANT NOTE:**    **INCLUDE SPECIFIC DATES, SPECIFIC EVENTS, AND ANY SPECIFIC COMMENTS MADE BY DEFENDANT PERTAINING TO THE DISCRIMINATION CLAIM ALLEGED ABOVE.**

- **May 4, 2022**
  - Now aware of the Plaintiff's disabilities, Manager of Security Operations, Vanessa Hurtado states, "in order to understand what you were taking. What medication you were prescribed is part of the investigation."
  - Sr. HR Generalist, Jennifer E. Garza-Vasquez states "you're going to work with me, don't provide them any information especially since they're asking for medical documentation."
  - When the plaintiff reiterated HR's instructions, Investigator Jonathan Herring coerces the plaintiff and states, "I'm going to provide them the information that you are declining...uh... to provide at this time. Just so you know, okay?"
- **On May 5, 2022**
  - Human Resources and Occupational Health requests the same medical documentation that the Security Department demanded. They additionally requested

a Fitness for Duty 22 days after the emergency appendectomy while the Plaintiff had already returned to work.

- o The Plaintiff was placed on involuntary administrative leave from May 6th through the 12th under the pretextual guise of a Fitness for Duty which presented no conflicts. This was after the Plaintiff engaged in a protected act by reporting the security department's medical exploitation to Human Resources via email, before the Defendant disabled the Plaintiff's laptop and company phone on which the plaintiff demonstrated professional matters pertaining to the discriminatory acts of the Security Department.

- **On June 1, 2022**
  - o The Defendant's Compliance Officer provided a high-level close-out of the plaintiff's formal complaint against the discrimination of the Security Department. Finalizing the close out with the statement of, "they're conducting an independent investigation, and we will have no bearing on the results of that investigation. Okay?"

- **On July 7, 2022**
  - o The plaintiff received a retaliatory termination letter with several pretextual reasons such as, "failed to show cooperation during the course of an investigation," after following the specific instructions of HR detailing not to provide the Security Department any medical information during their investigation. Additionally, "your performance during the probationary period also has not risen to the level of expectations for which you were hired." The plaintiff received no write ups and/or warnings and was never provided with an action plan or a performance review, nor was a standard of any nature set forth throughout the course of the Plaintiff's employment. Additionally, the plaintiff's publications can currently be found throughout Via buses, on billboards throughout San Antonio, and the Defendant's website.

---

8b.    List any **witnesses** who would testify for plaintiff to support plaintiff's allegations and the substance of their testimony:

- Jacob Betancourt, Spouse witnessed CPS Energy Discrimination and Retaliation
- John Jacobson, Clinical Director, LPC, Certified Clinical Trauma Professional
- Eileen Hernandez-Mother-in-law

---

8c.    List any **documentation** that would support plaintiff's allegations and explain what the documents will prove:

Exhibit 1-EEOC Notice of Right to Sue

Exhibit 2- CPS Energy Offer Letter

**31**

Exhibit 3- Baptist Medical Center Discharge Paperwork

Exhibit 4- Dr. Return to Work Note

Exhibit 5-CPS Energy General Workplace Policy

Exhibit 6-Pay Stub-Paid for ID Badge Reissue

Exhibit 7-One-party consent Audio Recording Clarification on Medical Document request

Exhibit 8- One-party consent Audio Recording Medical Documents part of their investigation

Exhibit 9- One-party consent Audio Recording Point of Contact Assigned HR Generalist

Exhibit 10- One-party consent Audio Recording Basically Requesting

Exhibit 11- One-party consent Audio Recording Submission Deadline Reminder

Exhibit 12- One-party consent Audio Recording Sr. HR Generalist Unaware

Exhibit 13- One-party consent Audio Recording Breaking HIPPA Laws

Exhibit 14- One-party consent Audio Recording HR and Legal Threats

Exhibit 15-Email Informing HR about Security Threats

Exhibit 16- Texas Medclinic Dr Notes

Exhibit 17- HR Leaves Voicemail about Sending Documents to Occupational Health

Exhibit 18- Email Receipt Sent Medical Documents to Occupational Health

Exhibit 19- Formal Complaint Sent to HR

Exhibit 20-CPS Energy Termination Letter

Exhibit 21-TWC Determination Chargeback

Exhibit 22- One-party consent Audio Recording Compliance Officer Closeout of Complaint

Exhibit 23- Work Sample

Exhibit 24-Mental Health Dr. Notes

Exhibit 25-Mental Health Dr. Notes

Exhibit 26-HR stance on Security Department requesting medical Information

**32**

9.    The above acts or omissions set forth in paragraphs 7 and 8 are:

[   ]  still being committed by defendant.
[ X ]  no longer being committed by defendant.

10.    Plaintiff should attach to this complaint a copy of the charge filed with the Equal Employment Opportunity Commission.   This charge is submitted as a brief statement of the facts supporting this complaint.

WHEREFORE, plaintiff prays that the Court grant the following relief to the plaintiff:

[   ] Defendant be directed to employ plaintiff.

[   ] Defendant be directed to re-employ plaintiff.

[   ] Defendant be directed to promote plaintiff.

[ X ] Defendant be directed to _____
and that the Court grant such other relief as may be appropriate, including injunctive orders, damages, costs and attorney's fees.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

11 | 13 | 2023
Date _____

Signature of Plaintiff

12305 SW Loop 410 Apt 13210
Address of Plaintiff

San Antonio, TX 78224
City                        State                        Zip Code

Telephone Number(s)   (210) 577-5959

33